577 P.2d 1123

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Clifford W. ADAMS,
Defendant-Appellant.**

No. 12581.

Supreme Court of Idaho.

March 31, 1978.

Rehearing Denied May 17, 1978.

James F. Judd, of Judd & Judd, Post Falls, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., James W. Blaine, Deputy Atty. Gen., Boise, Robert H. Thompson, Pros. Atty., Kootenai County, Coeur d'Alene, for plaintiff-respondent.

PER CURIAM:

The defendant pleaded guilty to the aggravated battery of his infant daughter. He appeals from the sentence of two years in the state penitentiary imposed by the district court, arguing that it is excessively harsh and an abuse of the trial court's discretion.

The defendant is married and the father of two daughters—Heidi, born in March, 1974, and Shawna, born in January, 1976. His relationship with the older child was normal in every respect, but the younger daughter would cry whenever he picked her up. The defendant and his wife consulted their physician regarding the younger daughter's tendency to cry when held by the defendant, but they were unable to resolve the problem.

On Saturday, October 30, 1976, apparently frustrated both by the younger daughter's continuous crying and by some problems at his employment, the defendant twisted the child's legs. The baby finally went to sleep and the defendant apparently did not realize that he had broken her legs. On the following Monday, November 1, 1976, again frustrated by the child's continuous crying and employment problems, the defendant suddenly struck the child with his hand, which later was found to have fractured the child's skull. The defendant obtained medical assistance for the child, representing that she had fallen from a chair. He later confessed that he had caused the child's injuries. Some broken ribs were also discovered and the defendant admitted that they were probably the result of a previous incident in which he had squeezed the child to stop her crying.

Following the incident on November 1, the defendant voluntarily began attending therapy sessions at "Parents Anonymous,"

a group designed to help parents with child abuse problems, and at the Community Mental Health Center in Spokane, Washington. The injured child is presently in the protective custody of the State of Washington, and a Washington court order prohibits the defendant from visiting her.

■ The defendant pleaded guilty to an information charging aggravated battery in violation of I.C. § 18–912. He requested an extended probation conditioned on his continued participation in therapy programs at the mental health center and Parents Anonymous and on his strict compliance with the orders of the Washington court concerning visits with his injured daughter. The state made no sentencing recommendations. The district court sentenced the defendant, who had no prior criminal record, to two years in the state penitentiary, observing that incarceration would not be of any rehabilitative value to the defendant but that it might deter others from injuring young children and encourage them to seek help beforehand. Following an unsuccessful motion to the district court for reconsideration of sentence, the defendant brought this appeal.

■ The two year sentence imposed by the district court is well within the statutory maximum sentence of three years in the penitentiary for the crime to which the defendant pleaded guilty. I.C. § 18–912. See State v. Ogata, 95 Idaho 309, 508 P.2d 141 (1973); State v. Butler, 93 Idaho 492, 464 P.2d 931 (1970). The district court acknowledged that the sentence would be of no rehabilitative value to the defendant, but nevertheless imposed the two year period of incarceration in order to deter others from committing similar offenses. General deterrence is one of the several objectives of criminal punishment and has been held to be a sufficient reason for imposing a prison sentence. See State v. Ogata, supra; State v. Moore, 78 Idaho 359, 304 P.2d 1101

(1957). See also State v. Allen, 98 Idaho 782, 572 P.2d 885 (1977).

Accordingly, we affirm the judgment and sentence imposed. However, we order the district court to retain jurisdiction for 120 days after the remittitur issues, as authorized by I.C. § 19–2601(4), in order to consider any recommendations of the Board of Corrections made pursuant to that section. State v. Jones, 98 Idaho 199, 560 P.2d 870 (1977); State v. Ogata, supra. See also I.C.R. 35.

The judgment and sentence of the district court is affirmed as modified.

BISTLINE, Justice, dissenting.

The Court today continues to wander down a familiar melancholy path, disposing of one criminal record appeal after another with an incantation of the ritual litany that the sentence imposed is within the maximum limits provided by statute, no abuse of discretion has been shown, and the judgment is affirmed. I disagree with the disposition of this case, upon a belief that the sentence should be commuted. In this area of sentencing review, it seems to me that the Court has somehow lost touch with its own traditional notions of justice, with universally recognized principles of contemporary jurisprudence, and with the manifest intent of the Idaho legislature.

If we bypass those cases in which this Court modified consecutive sentences by providing that they be served concurrently,[1] my review discloses that it has been 17 long years since this Court last modified a sentence as unduly harsh or excessive.[2] A reasonable conclusion to be drawn is either that there is no longer any meaningful appellate review of sentencing in Idaho, or that Idaho is an exception to the pattern of widespread inconsistency, inequality and injustice in trial court sentencing practices, which has been found by every survey ever

1. State v. Drapeau, 97 Idaho 685, 551 P.2d 972 (1976); State v. Monroe, 97 Idaho 457, 546 P.2d

854 (1976); State v. Ross, 92 Idaho 709, 449 P.2d 369 (1968).

2. State v. Ledbetter, 83 Idaho 451, 364 P.2d 171 (1961).

made and which annually generates a flood of outraged publications on the topic.[3]

As recently as 1969, an American Bar Foundation study concluded that, although "appellate review of sentencings is available in an increasing number of jurisdictions," more than half the states in the Union still "refused to review sentences that are within [statutory] limits." Dawson, Sentencing: The Decision as to Type, Length and Conditions of Sentence, p. 386. It is ironic that while other jurisdictions are only now beginning to appreciate the wisdom of permitting appellate review of sentences, this Court is retreating from an early and rich tradition of Idaho law which has long endorsed the practice.

## I.

The tradition of appellate review of trial court sentencing was established in this jurisdiction in 1907 in *State v. Neil,* 13 Idaho 539, 90 P. 860. The Court disposed of defendant's various assignments of error and sustained his conviction of the crime of assault with intent to commit rape. Then, although the defendant himself had apparently not raised the issue of excessiveness of sentencing, the Court addressed the question as follows:

> Our examination of the entire record in this case, which has been very thorough and in detail, convinces us that the sentence propounded against the defendant is too severe, and entirely disproportionate to the gravity of the offense. For the most aggravated cases of this kind the statute authorizes the maximum penalty of fourteen years. Here the defendant was given a ten years' sentence. *State v. Neil,* 13 Idaho at 553, 90 P. at 864.

The Court noted that no such aggravated circumstances were present in this case and that the woman, though "virtuous" had been somewhat "indiscreet" in dealing with the defendant. The Court then concluded:

> It is both the spirit and intention of our laws that sentence shall be imposed in criminal cases for the protection of society and the reformation of the culprit. As we view this whole case, the two years' imprisonment of the defendant will be as much protection to society and do him as much good as would ten. Ten years would practically ruin him for life. He is a young man yet [defendant was 26 years of age], and it is hoped that this experience will serve to reshape and reconstruct his views regarding his duties and obligations to those about him, and possibly inspire him with some higher and better notions than those only of gratifying his lust and sensual passions. We have concluded to modify the sentence to the extent of reducing it to a term of two years in the state penitentiary. *Id.* at 554, 90 P. at 864.

In *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921), the issue of appellate review of sentencings was more squarely posed. The barriers to review were formidable: the Court had already heard an appeal and affirmed the death sentence imposed on Ramirez; the remittitur had already gone down and the Court's further jurisdiction over the case was therefore called into question; an impressive body of case law from other jurisdictions was invoked by the State in order to preclude appellate review of a sentence which the legislature had put

---

3. Senate Concurrent Resolution No. 122, presently before the 1978 Idaho Legislature, directs the legislative council to "conduct a study of criminal sentencing and related matters." If the resolution is approved, the council will be empowered to study whether or not "there currently may exist a disparity in sentencing between different judges and judicial districts within the State which could cause an unfair burden on individuals coming under purview of the criminal justice system"; whether or not the "maximum and minimum ranges of possible penalties upon conviction for different crimes may be out of proper relationship in severity or leniency with other penalties for other crimes in the Idaho Code"; and whether or not the methods of determinate and indeterminate sentencing "create additional differential in sentences imposed, and conflicts of law or interpretation for defendants." The Senate Judiciary and Rules Committee apparently has an intuitive sense that the present system of sentencing in Idaho suffers from these defects.

in the hands of a *jury*. The Court, on rehearing, ruled that it had power to recall the remittitur. The Court then addressed the question of reviewability and left no doubt as to its power in that field. The legislature, it said, could not give a jury *exclusive* power to impose sentences. The sentence was held to merge with the conviction in district court and thus was subject to appellate review under Idaho Const. art. 5, § 9, which provides that "The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the judges thereof." Furthermore, statutory authority to reduce the sentence was said to derive from C.S., sec. 6446 [now I.C. § 19–2821] which, as it then read, provided that

> The [supreme] court may reverse, affirm or modify any order or judgment appealed from and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had.

The power of the Court to modify sentences was thus upheld "when the furtherance of justice requires such modification." *State v. Ramirez,* 34 Idaho at 634, 203 P. at 283. The source of this judicial power of "modification" was clearly distinguished from the corresponding executive power of "commutation":

> "The judicial power to modify a judgment and sentence, and the executive power to pardon, parole, or commute, are wholly distinct in their nature. The one is an award of justice, and the other is an act of grace. Commutation is a matter of discretion, and may be refused. Justice is imperative, and must not be denied. . . . In other words, the provisions of our criminal procedure act make it *the duty* of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence will not warrant." (Emphasis supplied.) (Quoting from *Fritz v. State,* 8 Okl.Cr. 238, 128 P. 170, 177 [1912].) *Id.* at 635–636, 203 P. at 283.

In short, Ramirez was seeking not clemency but justice and it was the Court's *duty* to review the record and modify the sentence if justice so required: "The right of courts to exist and to function rests upon their power to mete out fundamental justice." *Id.* at 637, 203 P. at 283. Idaho Const. art. 1, § 18 was said to demand as much in requiring that courts of justice be open to every person and that right and justice be administered. The *Ramirez* court, steeped in its constitutional duty, attentive to its statutory power, and diligent in reviewing the full record below, thus stands in stark contrast to almost 20 years of recorded history of sentence after sentence in this Court being left undisturbed because an abuse of discretion is not shown whenever the sentence is within the statutory limits, which a sentence invariably is.

Later decisions of the Idaho Supreme Court were to spell out the mitigating circumstances which, again and again, led to a modification of sentence "in the furtherance of justice." Many such mitigating factors are present in this case. In *State v. Behler,* 65 Idaho 464, 146 P.2d 338 (1944), for example, the sentence was modified because the Court found that the defendant's mental condition was such that he could not be "held to a full, strict accountability for his conduct." *Id.* at 475, 146 P.2d at 343. In *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953), the Court in modifying the sentence imposed below, focused on the defendant's previous conduct:

> [P]revious good or bad conduct should be considered in fixing the punishment for crime. . . . The courts have long recognized that the first offender should be accorded more lenient treatment than the habitual criminal. In addition to considerations of humanity, justice and mercy, the object is to encourage and foster the rehabilitation of one who has for the first time fallen into error, and whose character for crime has not become fixed. *Id.* at 402, 253 P.2d at 207.

The Court in *Owen* was impressed by the fact that, like Adams in this case, the defendant in that case was a first offender with no prior criminal record of any kind

and with a good military record which had ended in an honorable discharge.

In *State v. Sedam*, 62 Idaho 26, 107 P.2d 1065 (1940), one of the dissenting justices insisted that even short term sentences should come within the scrutiny of the Court. In that case, the defendant was sentenced to six months in the county jail for passing bad checks. Justice Budge, in words equally applicable to the present case, stated:

> To confine him in the county jail for six months and thus deprive him of earning support for his wife and child would be to inflict an unnecessary hardship upon those dependent upon him. *Id.* at 41, 107 P.2d at 1072.

In the present case, at the time of the sentencing hearing, defendant was attempting to hold down two jobs and was apparently making progress in paying off the family's accumulated debts. As his wife stated in her affidavit before the trial court: "In my opinion, sitting in jail would be a waste of time. Time that Cliff could be working and taking care of our personal debts." It is virtually assured that if Adams is sent to the penitentiary, his family will become dependent on state aid. Such an argument, of course, could also be made in the case of convicted murderers. The point is not that no wage earner should ever go to jail but that probation or work-release programs should be seriously considered as alternatives to short-term confinement and the enormous disruptions it entails. Neither this Court nor the court below has seen fit to give such factors the weight which the earlier holdings of this Court require.

Finally, in *State v. Linebarger*, 71 Idaho 255, 232 P.2d 669 (1951), the Court reduced a sentence for rape from twenty years to five years because "the facts of this case are not attended by such circumstances of aggravation as have attended other cases." *Id.* at 263, 232 P.2d at 675. The Court thereby indicated that its goal was not to substitute its own subjective judgment for the subjective judgment of the trial court, but rather to create a rational sentencing procedure at both the trial and appellate levels.

The undesirable disparity of sentences, so much decried by all commentators, can be alleviated if the Court looks to the seriousness between different categories of crimes as well as to the aggravating or mitigating circumstances present within a single category of crime. Without in any way seeking to minimize or condone the conduct of defendant in this case, it is fair to remark that it does not fall into the pattern of habitual, protracted, sadistic and unrepentant behavior one so frequently encounters in dealing with the "battered child" syndrome.

In sum, since its earliest days, this Court has recognized a constitutional and statutory duty to peruse the record conscientiously and to modify the sentence imposed by the trial court whenever justice so requires. In modifying sentences, the Court has given great weight to the age of a defendant, his capacity for strict accountability for his conduct, his status as a first offender or a habitual criminal, his conduct when compared to others similarly charged and the impact of incarceration on the defendant, his family and the community at large. I would submit that it is only by ignoring or interring those prior decisions that the Court can affirm the sentence in this case which dispatches Adams to two years in the state penitentiary.

## II.

In candor, it must be admitted that the majority's failure to provide meaningful review and modification of the sentence in this case is not without some case precedent. A second sporadic line of cases exists side by side with those I have just cited.

In *State v. Kruger*, 7 Idaho 178, 61 P. 463 (1900), the Court concluded that it had no power to review the sentence imposed by the trial court:

> In regard to the action of the trial court in pronouncing sentence in this case, we can only say the statute fixes the limits of punishment for the offense of which a defendant has been convicted, and within

the limits so prescribed the trial court has discretion, and we do not think that the exercise of such discretion is reviewable in this court. *Id.* at 183, 61 P. at 464.

That case lay in blessed and well-deserved oblivion till resurrected in *State v. Farnsworth*, 51 Idaho 768, 10 P.2d 295 (1932). In the latter case, a husband and wife were tried and found guilty of the identical charges of poisoning silver black foxes. The husband was sentenced to the penitentiary for a felony while the wife was sent to the county jail for a misdemeanor. Though there is some indication that such an outcome may have been motivated by concern for the wife's ill health, the Supreme Court made no such excuse and required no explanation from the trial court. Rather, the Court quoted approvingly the above language from *Kruger*[4] and set in motion the pernicious cliché that it was "a matter within the sound discretion of the court" to impose two totally different sentences for two defendants identically situated and found guilty of the identical crime. *Farnsworth*, along with *Kruger*, was routinely applied in *Davidson v. State*, 92 Idaho 104, 437 P.2d 620 (1968), as authority for the imposition of "three separate and varying sentences imposed upon appellant and two others similarly charged." *Id.* at 107, 437 P.2d at 623. *Kruger's* holding, however, had been superseded by the decision in *Ramirez*. *Farnsworth* either overlooked or ignored *Ramirez*, which was handed down after *Kruger* but before *Farnsworth*. The Court does presently recognize the validity of *Ramirez*, as witness the joint dissent of Bistline, J., and Shepard, J., in *State v. Jones*, 98 Idaho 199, 560 P.2d 870 (1977). As dead wood should be cleared away, *Kruger* and *Farnsworth* should be declared

overruled. The trial court "discretion," alluded to in these cases, under their respective circumstances, is a mere disguise for non-reviewability. As Judge Frankel notes:

> The talk about sentencing lying in "discretion," . . . bundles together a complex of conceptions and misconceptions that goes far to summarize the evils of the system. It is true that as we now handle this enormous power, trial judges are invited to proceed by hunch, by unspoken prejudice, by untested assumptions, and not by "law." But that is, as I have argued, the crux of what is wrong, not an argument for keeping things as they are. Frankel, Criminal Sentences: Law Without Order at 84 (1973).

All of which is not to say that the "abuse of discretion" cliché is wrong in itself. Though the expression generally smooths over trial court arbitrariness and appellate apathy, it need not be so understood.

> Correctly understood, the "discretion" of judicial officers in our system is not a blank check for arbitrary fiat. It is an authority, *within the law*, to weigh and appraise diverse factors (lawfully knowable factors) and make a responsible judgment, undoubtedly with a measure of latitude and finality varying according to the nature and scope of the discretion conferred. But "discretionary" does not mean "unappealable." (Emphasis in original.) *Id.*

In Idaho, by contrast, "discretion" has come to mean futile appealability. It is interesting, for example, to note the uncritical origins of the three clichés most frequently used in recent opinions. In *State v. Ogata*, 95 Idaho 309, 508 P.2d 141 (1973), the Court upped the ante by holding that a

---

**4.** It should be noted, however, that the *Kruger* Court's motive in holding sentences to be non-reviewable was the peculiar allocation of powers which existed at that time and which was alluded to in the immediately following sentence: "If the punishment prescribed is out of proportion to the crime of which the party has been convicted, its correction lies with another tribunal provided by law." *State v. Kruger*, 7 Idaho at 183, 61 P. at 464. The reference is apparently to the Board of Pardons. For a discussion of the extensive powers residing in that tribunal as it existed at the turn of the century, *see In re Prout*, 12 Idaho 494, 86 P. 275 (1906). No such parallel existed in 1932 so the *Farnsworth* Court simply omitted the all important sentence, quoted *Kruger* as authority solely for the proposition that sentences were non-reviewable and failed to distinguish *Ramirez* which had fully discussed and settled the matter in favor of reviewability in 1921.

defendant must show not just an abuse of discretion, but a *clear* abuse of discretion on the part of the sentencing court before this Court could grant relief. Authority for the addition of "clear" to the usual statement was based on *State v. Cypher*, 92 Idaho 159, 165, 438 P.2d 904 (1968) and *State v. Sedam*, 62 Idaho 26, 38, 107 P.2d 1065 (1940)—neither of which cases sustain the addition of such a restrictive adjective. The quotation in the former case concerns *trial court discretion in discharging a jury.* In the latter case, the defendant made no challenge to his sentence. As was noted in the opinion on appeal, such a quotation in *Sedam* was a gratuity and taken out of context from an earlier case dealing with *trial court discretion in denying a bill of particulars. State v. Neil*, 58 Idaho 359, 74 P.2d 586 (1937).

The second cliché which has come to the fore in recent opinions is that found in *State v. Cunningham*, 97 Idaho 650, 655, 551 P.2d 605, 610 (1976):

Excessiveness of punishment depends upon the circumstances of each case, and must be affirmatively shown by appellant. *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971); *Lockard v. State*, 92 Idaho 813, 451 P.2d 1014 (1969); *State v. Ross*, 92 Idaho 709, 449 P.2d 369 (1968); *State v. Peterson*, 87 Idaho 147, 391 P.2d 846 (1964).

None of the four cases cited are capable of being construed on sentencing review for the proposition that excessiveness "must be affirmatively shown" by the defendant. On the contrary, in *State v. Ross, supra,* responsive to defendant's bare assertion that it was error to sentence him to 30 years, the Court, upon its review, concluded:

Under all of the circumstances of this case it is the consensus of this court that a total indeterminate sentence of 30 years of penal servitude is unduly harsh and that the sentences on each of the three counts should run concurrently. I.C. § 19–2821. *State v. Ross*, 92 Idaho at 718, 449 P.2d at 378.

Moreover, as already noted in discussing *State v. Neil*, 13 Idaho 539, 90 P. 860 (1907),

the Court has not hesitated *sua sponte* to modify sentences found to be unduly harsh and excessive when the interests of justice so required. In *State v. Constanza*, 76 Idaho 19, 276 P.2d 959 (1954), for instance, though the Court noted that the issue had not been raised by defendant, the sentence of five years for conviction of the crime of receiving stolen property was found excessive and was reduced to three months in the county jail and a $500.00 fine.

A third, and most damaging, cliche found in recent opinions is that which appears to have been first enunciated in *State v. Gish*, 89 Idaho 334, 338, 404 P.2d 595, 597 (1965):

It has also been held that a sentence fixed within the limits prescribed by statute will not ordinarily be considered as an abuse of discretion by the trial court. *State v. Powell*, 71 Idaho 131, 227 P.2d 582; *State v. Farnsworth, supra.*

*State v. Powell*, as I read it, did not involve a challenge as excessive made to a sentence which was within maximum statutory limits. The two defendants in *Powell* entered guilty pleas to charges of first degree murder. A contention on appeal was a trial court abuse of discretion in sentencing the defendants to death in view of their young ages. The issue there was whether it was an abuse of discretion not to give the alternative sentence of life imprisonment, with the Court holding:

Upon a plea of guilty, the trial judge is clothed by the statute with the power and duty of fixing the punishment. It is within his sound discretion to determine whether the punishment shall be life imprisonment or death. Unless such discretion is abused, it will not be disturbed by this court. *State v. Arnold, supra.*

*State v. Powell*, 71 Idaho at 136, 227 P.2d at 584. As examples of the *Gish* doctrine, *see State v. Cornwall*, 95 Idaho 680, 684, 518 P.2d 863 (1974); *King v. State*, 91 Idaho 97, 98, 416 P.2d 44 (1966). *Farnsworth*, as mentioned earlier, quotes approvingly the far stronger language of the turn-of-the-century *Kruger* case which held that sentences within statutory limits are simply non-reviewable. I submit that to say that a

sentence fixed within statutory limits "will not ordinarily be considered as an abuse of discretion by the trial court," effectively closes the door on appellate review. It implies that the only way a trial court can "abuse" its "discretion" is by fixing a sentence in excess of the statutory limits. But a trial court has no "discretion" at all to impose a sentence in excess of statutory limits; such a sentence would be illegal.

### III.

In sum, we have two lines of cases lying side by side in the pages of the Idaho Reports. In the first, the Court acknowledges an affirmative duty to make a thorough review of the record, to insist upon reasoned consideration of all relevant factors by the sentencing court, and to modify the sentence imposed whenever such modification is necessary in order to avoid injustice to the individual or to insure the even-handed administration of justice throughout the State.

The second line of cases, on the contrary, manifests a decidedly hands-off approach, puts upon the defendant the affirmative burden of showing a *clear* abuse of trial court discretion and then makes that burden impossible to carry by saying that no such abuse will "ordinarily" be found so long as the sentence imposed is within the limits fixed by statute.

For myself, I have no problem in choosing the first as the better line of cases, the one most in tune with the Constitution and statutes of Idaho and this Court's role as an appellate tribunal. The second line of cases, in the words of the American Bar Foundation study, denotes a "failure of the system to achieve the goal of equal justice under law." When such a system stands uncovered, "it is likely to undermine public confidence in the administration of criminal

justice." And, whether the public knows of it or not, the system cannot help but have "severe demoralizing and anti-rehabilitative effects on prisoners who receive harsher sentences than others in comparable situations." In short, it stands for an unconscionable "willingness often to give administrative convenience a higher priority than the proper disposition of the individual offender." Dawson, Sentencing (1969) at 216.

This Court has the power to and should foster a sentencing system which dispenses individualized justice and yet avoids unjustifiable disparity. Wholeheartedly it should endorse the practice of having "sentencing councils" meet in advance of sentencing so that the sentencing judge may have the benefit of the collective wisdom of his peers.[5] Such a procedure, I understand, is already in some use in the Sixth Judicial District.

### IV.

This Court appears to have last exercised its own discretion in reducing a single sentence as unduly harsh and excessive in *State v. Ledbetter,* 83 Idaho 451, 364 P.2d 171 (1961). *Ledbetter* has been heavily relied upon by every defense counsel who has attempted to gain Supreme Court modification of a sentence in the last 17 years. The case bears close analysis for the many parallels it provides to the case at bar. While counsel for defendants have cited *Ledbetter* as authority for the proposition that this Court has the power to and has modified sentences, counsel do not seem to have gone to that file in order to ascertain just what manner of argument was there made in what appears to be the last success in gaining appellate modification of a sentence, other than where consecutive sentences were modified to concurrent, as in *State v.*

---

5. In all courts where more than one judge sits regularly at the same place, and wherever else it is feasible, it is desirable that meetings of sentencing judges be held prior to the imposition of sentence in as many cases as is practical. The meeting should be preceded by distribution of the presentence report and any other documentary information about the defendant to each of the judges who will participate. The purpose of the meeting should be to discuss the appropriate disposition of the defendants who are then awaiting sentence and to assist the judge who will impose the sentence in reaching a decision. Choice of the sentence should nevertheless remain the responsibility of the judge who will actually impose it. A.B.A., Sentencing Alternatives and Procedures (1968) at 294.

*Ross, supra. Ledbetter's* counsel submitted that his client was a proper candidate for probation for all of the same reasons which are applicable to Adams in this case: he was the product of an unfortunate upbringing; his crime was the result of mental instability, not the product of a habitual criminal disposition; he had admitted his guilt, repented and sought help for himself by undertaking and diligently pursuing a counseling program to correct his problem; he was a first offender who was otherwise an industrious, honest and productive member of society; and he had the strong support of an understanding and forgiving wife.[6]

There as here, however, the case boiled down to the weight which the sentencing court would give to the final factor, namely, "the interests of society." Ledbetter's attorney, in his appearance before the trial court, faced the issue squarely:

I think the big problem involved here is in the fourth item, the interests of society. Basically the question is this: is the interest of society going to be served by the probationary sentence for this man or is it going to be best served by incarcerating him in a state prison?

Relying upon the factors mentioned above, counsel argued that Ledbetter's prospects for successful treatment were excellent and that he would serve a good probation, thereby saving his family from becoming "wards of the state."[7]

Balanced against all of this were the interests of society: punishment and deterrence. On that topic, the learned defense counsel in *Ledbetter* had this to say to the trial court:

The other side of the coin is that society can demand its vengeance, its pound of flesh, and it can put the man in prison.

Or, as he summed up the entire issue in his brief on appeal:

5. INTERESTS OF SOCIETY: The record shows that defendant *would not* be dangerous to society if at liberty. This being true, then the only interest of society to be served by incarceration is that severe punishment would serve a deterrent to others committing similar crimes. But it is common knowledge to all familiar with cases such as this, that such crimes are committed by persons suffering from mental or personality disorders and that examples of punishment do not deter commission of such crimes. In fact many experts believe that long periods of incarceration of cases such as defendant utterly destroys any hope of correction and rehabilitation, and very greatly increases the prospect that the person, when released after long imprisonment will be a potentially very dangerous individual. . . .

The record shows there is no danger to society from appellant and that he can be rehabilitated. Experience demonstrates to all of us more eloquently than words that cases of this type are not rehabilitated in prisons and that harsh punishment is no deterrent to others in like circumstances.

In short, counsel argued successfully to this Court that Ledbetter was well on his way to rehabilitation and that incarceration at the state penitentiary would, in all likelihood, do him more harm than good. Incarceration on grounds of deterrence could not be justified because deterrence could not be expected to play a role on perpetrators of crimes of this sort.

---

6. Such were the general tests which the Court had laid down in *State v. Mitchell*, 77 Idaho 115, 289 P.2d 315 (1955), in construing I.C. § 19–2601, the Idaho probation statute in effect at that time.

7. The factors stated in Ledbetter's brief before this Court apply with equal strength in the present case:

Following his arrest and release on bond, defendant obtained psychiatric help to determine the reasons for his action and prognosis of his future actions. It was found he suffered from a character disorder directly traceable to his childhood background in the social, cultural and environmental areas. He was found to be well motivated for treatment and to have the strength of character, intelligence and insight to be able, with treatment, to correct and overcome his character disorder.

In stark contrast are the remarks of the trial court at the sentencing hearing of Clifford Adams. The judge first observed that Adams was a "very capable, productive, functioning member of society." Incarceration, he stated would cause "a great disruption" to defendant's family. Moreover, the court freely told Adams "that any period of incarceration in your case is not going to do anything in particular indicated in the rehabilitation of yourself." Nonetheless, society was said to require imprisonment on grounds of general deterrence:

> I am also aware, however, that there are other cases of this type, probably many more occur from what social scientists tell us than are ever officially reported or come to light in the way of criminal charges or in news reports of things of that kind.
>
> I think one of the other things then that I must look at in sentencing is what we speak of as the deterrent effect. Perhaps others would be made aware of their problems and to seek help before young children are injured such as had happened in your case. . . . It's really hard to conceive how any fellow human being could inflict such pain on a helpless infant. Perhaps as a deterrent example to others it will serve to get other people so inclined to seek help before injuries occur instead of afterwards.

I submit that defense counsel in *Ledbetter* was closer to the mark in 1960 than was the trial court at this sentencing 17 years later.

## V.

An emotionally unstable father has beaten his four month old infant, broken her legs, fractured her skull and injured her ribs. A normal first reaction is anger and thoughts of retribution. Undoubtedly there are many who would jump to the emotional conclusion that a life sentence would not be unjust. With even the slightest distance, however, we must realize, as did the trial court, that incarceration will serve Adams no purpose whatsoever: not rehabilitation, because that will be more assured if Adams is permitted to continue the program he is now so assiduously following; not protection of the child, because the State of Washington has already taken means to insure that there will be no further contacts until Adams has demonstrated that he has overcome his problems; not deterrence, because crimes of this sort will not be deterred.[8]

The prosecuting attorney, faced with these considerations, apparently could not bring himself to recommend incarceration. At any rate, he did not, which omission evoked from the trial court this unveiled censure:

> [I]t seems that the people, and it would seem to this court, that the people speaking through the office of the duly elected prosecuting attorney should have a greater concern for the sentence imposed than has been expressed in this case. . . .
>
> I find the silence of the prosecutor's office in this a very strange and almost an indifference as it seems to me to the whole situation.

The trial court was also willing to look elsewhere for Adams' salvation. He asserted that he was "mindful of the fact of the authority of the Board of Corrections to commute, parole" and that, given "the probability that Mr. Adams would be a very model prisoner," it was likely that he would be paroled in 8 to 10 months. Finally, the trial court twice reminded defense counsel that he had the "right to appeal to the Supreme Court in this matter and that the appeal may be based specifically on the grounds of the abuse of discretion in the sentencing."

8. Even the State admits as much in a brief which turns its back on both the deterrence and rehabilitation values of imprisonment:

> We . . . question whether the prosecution of persons violating the criminal laws of this state are much of a deterrence on others from committing similar crimes. We question whether there ever is a fair chance to rehabilitate the majority of the first time offenders or whether punishing a human being by incarceration for his crime will cause that individual to mend his ways and conform to the standards society has adopted.

In short, though the sentencing decision was undoubtedly searchingly made, it is not the correct one; and modification, to my mind, seems in order. This Court, however, while it does gently rebuke the trial court for giving exclusive attention to general deterrence, which is "but one of several objectives" in sentencing, nonetheless affirms the sentence. In doing so, the Court today takes the same course as in *State v. Jones*, 98 Idaho 199, 560 P.2d 870 (1977), not modifying an improper sentence and not giving any reason for failing to do so, but dropping a timid hint to the trial court by ordering that 120-day jurisdiction be retained. Unlike our predecessors who have sat on this bench before us, we are forced to adopt

> the inelegant role of supplicant before the trial judge. Confessing impotence to review the sentence . . . the appellate opinion will suggest that the sentence seems, perhaps, a bit barbarous and would the trial judge perhaps, when the case comes back to him, please be willing to have another look. Frankel, Criminal Sentencing at 82.

When justice so requires, the Supreme Court of Idaho should not indulge in mere hints.

In *State v. Yockey*, 57 Idaho 497, 66 P.2d 111 (1937), the Supreme Court reversed a trial judge who, by his own admission, was "wrought up about the matter" and who sentenced two young burglars to terms in the penitentiary from one to fifteen years solely in order "to set an example to others inclined to do wrong." The Court held that such a ruling by the trial court was not in an exercise of discretion at all since the consideration and balancing of factors (now required by statute) had never taken place.[9]

9. I.C. § 19-2521 lists the "criteria for placing defendant on probation or imposing imprisonment." The statute was passed on March 10, 1977, but was not yet in effect when the trial court held its final sentencing hearing in this case on March 29, 1977. The statute begins with a presumption in favor of probation and against imprisonment unless imprisonment is justified by the nature of the crime, the needs of the particular defendant and the protection of society. As in *Yockey*, the determination

The Court therefore remanded to the same trial judge for resentencing, much as today we timidly instruct the trial court to retain 120-day jurisdiction and consider the recommendations of the Board of Corrections. Justice Ailshie, in dissent, demanded more of his brethren:

> Now the question arises: Suppose the trial judge enters the same judgment as he entered before, what is this court going to do about it? If this court thinks the judgment is too harsh and wants to modify that judgment, why not do so? 57 Idaho at 506, 66 P.2d at 114.

A review of the record and the briefs of counsel convinces me that this Court should in the interests and furtherance of justice modify the sentence. As I said in *State v. Palmer*, 574 P.2d 533 (filed Jan. 10, 1978), and again in *State v. Phillips*, No. 12618, 99 Idaho 354, 581 P.2d 1173 (1978), I can see no benefit to defendant or to society in sending *this* defendant off to the state penitentiary. The opinion of the Court today observes:

> The district court acknowledged that the sentence would be of no rehabilitative value to the defendant, but nevertheless imposed the two year period of incarceration in order to deter others from committing similar offenses.

In sustaining the trial court, the Court relies upon *State v. Jones, supra,* and *State v. Ogata, supra.* Both the *Jones* and *Ogata* defendants were commercially engaged in distributing heroin in their respective communities. The Court correctly observed in *Ogata* that

> To the extent that the view is accepted that one of the primary purposes for the enactment of criminal laws is to deter members of society from conduct which is

cannot really be said to have taken place at all if the trial court fails to consider and to balance the various factors but gives exclusive weight to one. The sophisticated balancing test set forth in I.C. § 19-2521 becomes meaningless if, as here, the Court does not demand a balancing, offers no guidance to the lower judiciary as to how the various factors are to be weighed, and is willing to permit any single factor chosen by the trial court to outweigh all other factors.

deemed harmful, it is inconsistent to hold that enforcing those laws by inflicting legislatively prescribed punishment can never be motivated by deterrence. 'General deterrence' continues to be a proper consideration in the imposition of punishment, though certainly not the only criterion.

Here the sentence should be modified by commutation to a jail term not to exceed one year. In that way it is the district court and not the State Board of Corrections which is empowered to establish the probation which may or may not be granted, and the defendant can be awarded such jail time as the court may conclude is necessary to bring about any deterrent effect which might perchance be achieved. It would seem more likely that the "others" who might benefit from any type of incarceration for the involuntary offense here committed would gain nothing where the defendant is shipped off to the penitentiary at Boise and then forgotten. Contrariwise, where it becomes general knowledge that he is made to remain in his community and undergo his penance, a possibility of deterrence might in fact exist. Commutation to a jail term also enables the district court to allow the defendant work releases, and keeps him in the mental health program in which he is already enrolled. The defendant is no threat to society. If placed on work releases, not only will he not be a burden on society but he can support his wife and two children.

### VI.

While the approach I advocate in this dissent might be interpreted as an attempt to more deeply involve this Court in the sentencing business, I suggest only that the Court is already so committed, and all that is at stake is a realization of the proper guidelines. Nor is it that I advocate persistent tinkering with trial court sentences. I do not. As much as any other member of this Court, I am predisposed, upon review,

to defer to the well-considered decisions of the district judges of Idaho. *See State v. Phillips*, No. 12618, —— P.2d —— (filed February 9, 1978). That review must, however, be made, and I do not feel that the overall past record of the last decades shows that it is. As is shown by *State v. Ross, supra*, an abuse of trial court discretion has occurred when such is the consensus of this Court. It is a judgment call—by a 5-member court reviewing the decision of a 1-member court. Where a majority of this Court reach a different conclusion on the justness of a sentence, there should be no hesitation in speaking out. I suggest that the trial court may want to keep in mind that upon the remittitur going down, and the 120-day retention of jurisdiction becoming an effective part of the sentence, the appropriate statutory provisions do not require a trial court to wait out the full 120 days and a recommendation from the State Board of Corrections as a condition precedent to suspending execution of the sentence. I.C. § 19–2601. In *State v. Phillips, supra*, such a proposition was argued by the State, and clearly the statute so allows.

### VII.

Our sister state of Montana, for more than a decade now, has had a "review division of the supreme court" empowered to hear appeals from district court sentences in felony cases. Mont.Rev.Codes Ann. § 95–2401 to 2504.[10] Such a system, now well-seasoned, it seems to me, points to a direction we could and also should consider taking. Montana's review panel is made up of three district court judges, men experienced in and still practitioners of the art of sentencing. The decisions of such a body, I understand, are widely respected because they emanate from a group of one's peers and are founded upon a thorough review of all the pertinent documents in the case. The State is represented by its proper and logical advocate, namely, "the county attor-

10. I do not mean, of course, that the Montana statute is a precise blueprint for adoption in Idaho. The statutory provision that a review panel have the power to increase as well as to decrease the sentence imposed is controversial and would require extensive discussion. *See* the American Bar Association study on Appellate Review of Sentences (1968) at 2–5.

ney of the county in which the sentence was imposed," *Id.* § 95–2503, rather than, as under our present system, by the office of the Attorney General which, having no first-hand familiarity with the case below, consequently seems prone to look for the resolution of sentencing appeals by merely repeating back to this Court that which this Court has already declared as Idaho's standards of sentencing review.[11] Rational decision making is fostered by the single-mindedness of the Montana review division's task and the insistence that the panel provide reasons for each decision it reaches. Finally, it is my understanding that the existence of the panel has substantially reduced the workload of the Supreme Court.

As I read the Idaho Code, no additional statutory authorization is needed in order for this Court to put such a plan into effect. Chapter 3 of Title 1 of the Idaho Code already provides for the appointment of "Commissioners for the Supreme Court," from among "the duly elected, qualified and acting district judges of the state of Idaho." Nothing further is necessary:

> All that shall be legally required to constitute such commission, and authorize each commissioner to act, shall be the making and entering by the Supreme Court of the order of appointment or substitution of such commissioners. It shall be the duty of said commissioners, under such rules and regulations as the court may adopt, to assist the Supreme Court in the performance of its duties and the disposition of the numerous causes now or hereafter pending in said court, and undetermined. I.C. § 1–301.

My own personal belief is that the Idaho district judges, notwithstanding the agonizing that is occasioned by every sentencing, are not swept along by pride of authorship, so to speak, and are not incensed by appel-

late sentencing review. I submit, therefore, that the Idaho district judges would be receptive to a system where that sentencing review is conducted by their own peers, who, as this Court's commissioners, would either recommend affirmance or modification, which all will agree, I am certain, would quickly be adopted by this Court and a final disposition thus had.[12]

---

11. For instance, in *State v. Powell*, 71 Idaho 131, 227 P.2d 582 (1951), the Attorney General may have fostered some of the appellate approach of which I complain by urging upon the Court that the Court's authority to modify a criminal sentence is confined to "cases where it clearly appears from the record that the trial court has abused its discretion in imposing

sentence," citing *Ramirez, Behler,* and *State v. Arnold,* 39 Idaho 589, 229 P. 748 (1924).

12. Apparently this Court has never held that it has the power to modify a sentence by increasing its severity. For that reason a statutory enactment might be required in order to bring into play the entire scheme of the Montana system.